j562van1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,                New York, N.Y.
3
                v.                           18 Cr. 30(PAC)
4
    PAUL VAN MANEN and KENNETH
5   CHARLTON,
6                   Defendants.
    ------------------------------x          Trial
7
                                             May 6, 2019
8                                            10:20 a.m.
    Before:
9
                        HON. PAUL A. CROTTY,
10
                                             District Judge
11                                           - and a Jury-

12                      APPEARANCES
    GEOFFREY S. BERMAN
13       United States Attorney for the
         Southern District of New York
14  BY:  JESSICA K. FENDER
         RYAN B. FINKEL
15       CATHERINE E. GHOSH
         Assistant United States Attorneys
16
    QUIJANO & ENNIS, P.C.
17       Attorney for Defendant Van Manen
    BY:  PETER E. QUIJANO
18       ANNA N. SIDERIS
19  O'NEILL & HASSEN
         Attorney for Defendant Charlton
20  BY:  GRAINNE E. O'NEILL
21  THE LAW OFFICE OF CARLOS M. SANTIAGO
         Attorney for Defendant Charlton
22  BY:  CARLOS M. SANTIAGO, JR.
23
    ALSO PRESENT:
24
    MADISON DUNBAR, Paralegal, U.S. Attorney's Office
25  WILLIAM COLEMAN, Paralegal, U.S. Attorney's Office
    LILY LAU, Paralegal, Quijano & Ennis

j562van1

| | |
|---|---|
| 1 | (In open court) |
| 2 | THE COURT:  Good morning.  The jury is just about |
| 3 | ready, but I thought I would -- we received a number of motions |
| 4 | over the weekend.  I'm going to rule on those motions now. |
| 5 | With respect to the government's motion to redact the |
| 6 | racial slurs in CW1's text message, that motion is granted. |
| 7 | The request to modify the protective order is denied. |
| 8 | With respect to character evidence for Mr. Van Manen |
| 9 | and Mr. Charlton, I'm going to allow that to a limited extent. |
| 10 | It's contingent on their taking the stand.  Because if it is |
| 11 | just testified to or spoken of by counsel, counsel is not sworn |
| 12 | and they can't testify, and the opening statements are supposed |
| 13 | to be predictions of what is going to be said in evidence, |
| 14 | admitted into evidence in the courtroom.  So I'm prepared to |
| 15 | allow a limited explanation or exposition of the defendants' |
| 16 | character in the opening statements; but, as I say, it is |
| 17 | contingent on their taking the stand.  If they don't take the |
| 18 | stand, the remarks by counsel will be subject to being |
| 19 | stricken. |
| 20 | With respect to the Exhibits 262, 267, 268, 269 and |
| 21 | 270, I will allow one picture only. |
| 22 | And with regard to the proffer statement, I can't rule |
| 23 | on that now because I don't know what the statements are.  I |
| 24 | note, for example, in the last statement covered by |
| 25 | Mr. Quijano's letter about defendant's proffer number 12 the |

j562van1

1   defendant will not contest that during certain -- you are

2   asking for rulings on things that might not happen.  As

3   Mr. Quijano says in his letter, he is mindful of the parameters

4   which would lead to the introduction of the defendant's proffer

5   statement should he argue or introduce evidence that

6   contradicts statements made during his proffer with the

7   government.  I will take him at his word.  We will just have to

8   see what the statements are and make rulings as we go along.

9              Anything else anybody wants to take up?

10             MR. QUIJANO:  No, your Honor.

11             MS. O'NEILL:  No, your Honor.

12             MR. FINKEL:  Just two or three housekeeping measures

13   that I want to put on the record.  First, since I handed this

14   up to Mr. Gonzalez, the parties have three additional names to

15   add to the people and places list.  One was from the

16   government.  It is an Albanian interpreter.  Two were possible

17   witnesses that defendant Kenneth Charlton would call.

18             It is the government's understanding that this

19   universe -- there is no one else in the universe of possible

20   witnesses that the defendants may call.  We would ask that the

21   court inquire that that is correct to ensure that the jury is

22   properly *voir dire*d on all of the possible people who can

23   appear as witnesses at this trial.

24             THE COURT:  Ms. O'Neill.

25             MS. O'NEILL:  So far we have no other additional

j562van1

1   witnesses.  I have nothing else really to speak about that.

2                   THE COURT:  Okay.

3                   Mr. Quijano.

4                   MR. QUIJANO:  Nothing further, your Honor.

5                   THE COURT:  Okay.

6                   MR. QUIJANO:  We have no witnesses other than the

7   defendant, possible.

8                   THE COURT:  Okay.  I understand.

9                   MR. FINKEL:  Can I just put on the record, your Honor,

10  two other issues?

11                  One, Philip -- I hope I am pronouncing this

12  correctly -- Primason, which is one of the witnesses that

13  defendant Kenneth Charlton may call, the defendants have agreed

14  to exclude him from the courtroom even though he worked with

15  the prosecution team in case he is called as a witness.  Sorry,

16  defense team.

17                  And, second, just to let your Honor know, we have

18  prepared transcripts of some of the call recordings that will

19  be played when witnesses take the stand.  We are prepared to

20  hand up packets of the various transcripts for the jury to

21  review.  They are not being offered as evidence, just as an aid

22  to the jury during the testimony of a witness.

23                  THE COURT:  All right.

24                  Ms. O'Neill.

25                  MS. O'NEILL:  Just for clarification, it is Philip

j562van1

1  Primason, not Primason.

2             THE COURT:  Okay.  Thank you for the clarification.

3             (Pause)

4             MR. FINKEL:  Your Honor, if I may just put one

5  additional item on the record?  Defendant Kenneth Charlton's

6  team has asked the government to assist them in getting a writ

7  for Nicholas Mogavero, who is a witness they may call.  The

8  government has asked your Honor to sign the writ.  We are going

9  to process that with our criminal clerk's office.

10            THE COURT:  I signed the writ.

11            MR. FINKEL:  Yes.  I just wanted to put it on the

12  record.

13            THE COURT:  Thank you.

14            MS. O'NEILL:  Thank you, your Honor.

15            (Jury of 12 and 2 alternates impaneled and sworn)

16            THE COURT:  Here is what we are going to do now.  We

17  are going to give you some preliminary instructions, then we

18  will take an afternoon break, then the parties will make

19  opening statements and, if we are lucky, we will have our first

20  witness sworn and start his testimony today.

21            But I want to take a few minutes now to give you some

22  initial instructions about this case and about your duties as

23  jurors.  After all the evidence is in and the lawyers have

24  summed up, I will give you final instructions, and then you

25  will begin your deliberations.  I may also give you

j562van1

instructions during the trial.  Unless I specifically tell you

otherwise, all such instructions -- both those I give you now

and those I give you later -- are equally binding on you and

you must follow them.

Your duty is to find from the evidence what the facts

are.  You, and you alone, are the judges of those facts, and

then you apply the law as I give it to you to the facts as you

find them to reach your verdict.  You have to follow the law

whether or not you agree with it.  Now, please remember that

nothing I may say or do during the course of the trial is

intended to indicate or should be taken by you to be indicating

what your verdict should be.  Your verdict is up to you.  It is

strictly up to you.

I have already told you about the charges alleged in

this case.  The defendants, Paul Van Manen and Kenneth

Charlton, are charged with conspiring to violate the narcotics

laws of the United States and were appropriately indicted by a

grand jury sitting here in this district.  The indictment

charges that from at least in or about 2013, up to and

including in or about January 2018, Mr. Van Manen and

Mr. Charlton, along with others known and unknown, conspired to

distribute, or possess with the intent to distribute,

controlled substances, specifically heroin and fentanyl.  The

indictment further charges as to Mr. Van Manen only that the

use of heroin and fentanyl distributed through the conspiracy

j562van1

1    resulted in the serious bodily injury of an individual named

2    Shaun Sullivan on or about October 5, 2017, and the death of

3    another individual, Michael Ogno, on or about December 1, 2017.

4    Mr. Van Manen and Mr. Charlton deny these allegations.  The

5    government must prove the charges in the indictment beyond a

6    reasonable doubt.

7         The evidence from which you are going to find the

8    facts will consist of the testimony of the witnesses who will

9    sit right next to me in this chair, documents and others things

10   that will be received in evidence, and occasionally facts that

11   the parties may agree to, which we call stipulations.

12        Now, certain things are not evidence, and you should

13   not consider them.  I'm going to list them for you.

14        First of all, the attorneys' arguments are not

15   evidence.  The attorneys are not sworn as witnesses.  They are

16   not under oath, and they do not testify.  The attorneys'

17   statements and questions are not evidence either.  Let me

18   emphasize this again.  It is not the question that the lawyer

19   asks, what is important is the witness's answer to the

20   question.

21        Secondly, objections to questions are also not

22   evidence.  It is the duty of the attorneys for each side of the

23   case to object when the other side offers testimony or other

24   evidence that the attorney believes is not properly admissible.

25   You should not be influenced by objections or by my ruling on

j562van1

it.  If the objection is sustained, you will hear me say
"sustained."  Then you should ignore the question.  If I
overrule the objection, then you should treat the answer just
like any other answer.  My job is to rule on what evidence
comes in at the trial, but I have no view on what your verdict
should be, because that is strictly up to you, the jury, to
decide.

            If I instruct you that some evidence is being received
for a limited purpose only, you must follow that instruction.
Now, you don't have to worry about this right now.  There may
not be a limiting instruction in this case.  But if there is, I
will explain it to you at the time and will give you
instructions as clearly as I possibly can on what the
limitations are.  I may tell you that I am excluding testimony
or tell you to disregard testimony.  When I do that, it means
you should follow my instructions and ignore the testimony as
it is not in evidence.

            In addition, anything you may have seen or heard
outside of this courtroom is not evidence and should be
disregarded.  You are to decide this case solely on the
admissible evidence that is presented here in the courtroom.

            There are two kinds of evidence that I want to review
with you -- direct evidence and circumstantial evidence.
Direct evidence is proof of a fact.  An example of that would
be an eyewitness, somebody who actually saw the event as it

j562van1

occurred.  Circumstantial evidence is proof of a fact or facts

from which you may infer or conclude that some other fact or

facts exist.  Obviously I'm going to give you further

instructions on this and more details on these and other

matters at the end of the case, but just keep in mind that you

can consider both kinds of evidence, both direct and

circumstantial.

Now, a very important task for every jury is to decide

the credibility of witnesses, and it is going to be up to you

to decide which witnesses to believe, which witnesses not to

believe, how much of any witness's testimony to accept or

reject.  Again, in my instructions to you at the end of the

trial, I will give you some guidelines which I hope will be

helpful in determining witness credibility.

Remember what we discussed earlier.  First, a law

enforcement witness's testimony gets no greater or lesser

weight because of their law enforcement status.  Second,

cooperating witness's testimony can be considered but, as I

will instruct you, you should consider it with great care.

This is a criminal case.  You must know that there are

three basic rules about criminal law that you have to keep in

mind:  (1) the defendants are presumed innocent; (2) the

government has the burden of proof; and (3) the government must

prove its case beyond a reasonable doubt.

Let me go through these separately now.

j562van1

1          First, as I mentioned, the defendants are presumed

2     innocent until proven guilty.  The indictment against the

3     defendants brought by the government is only an accusation and

4     nothing more.  It is not proof of guilt or anything else.  The

5     defendants, therefore, start out with an absolutely clean

6     slate.

7          Second, the burden of proof is on the government.  The

8     defendants have no burden to prove their innocence or to

9     present any evidence or to testify.  Since they have the right

10    to remain silent, the law prohibits you from arriving at your

11    verdict by considering that the defendants may have not

12    testified.

13         Third, the government must prove the defendants' guilt

14    beyond a reasonable doubt.  Again, I will give you further

15    detailed instructions on this point later, but bear in mind

16    that in this respect, a criminal case is different from a civil

17    case.  The criminal standard of proof is proof beyond a

18    reasonable doubt.

19         From time to time during the trial, it may become

20    necessary for me to talk with the lawyers out of the hearing of

21    the jury, either by having a conference at the bench when the

22    jury is present in the courtroom -- that's what we call a

23    sidebar -- or by calling a recess.  Please understand that

24    while you are waiting, we are working.  The purpose of any

25    conference outside your viewing is not to keep relevant

j562van1

1    information from you, but to decide certain procedural issues

2    and how certain evidence is to be treated under the rules of

3    evidence and to avoid confusion and error.

4              Now just a few words about your own conduct as jurors.

5    First of all, do not discuss the case with anyone or permit

6    anyone to discuss it with you.  Most of you probably use

7    computers.  My instruction to not discuss the case includes

8    discussing the case in person, in writing, by phone or

9    electronic means, via text messaging, e-mail, Facebook,

10   Twitter, blogging, or any other form of social media.  This

11   even includes discussing the case with your fellow jurors in

12   the jury room while the trial is going on.  You cannot

13   deliberate on your verdict until after you are charged by me,

14   and that takes place at the end of the trial.  Until then, you

15   simply cannot talk about the case, so you can talk to each

16   other about almost anything that you would like, but don't talk

17   about the case.

18             Now, I'm sure this may seem strange to you.  Here is

19   the reason.  Obviously the evidence can only be presented one

20   witness at a time and one exhibit at a time.  we don't want you

21   to start talking to each other and reaching conclusions before

22   you've had an opportunity to see and hear all the evidence in

23   the case and hear my instructions on the law.  So that is why

24   we direct you to begin your deliberations at the end and, until

25   that time, not to have any discussion about this case.  Think

j562van1

of the case like a painting where you cannot tell from one
stroke or color what the painting will look like.  You have to
wait until it is finished to make a judgment, and that's what
we ask you to do.

          If at any time during the course of this trial any
person attempts to talk to you or communicate with you about
the case, either inside or outside the courthouse -- and I
certainly hope this does not happen -- you should immediately
report such an attempt to me.  Don't bring it to the attention
of other jurors, just send me a note directly.

          Also the lawyers and other participants at the counsel
table have been instructed not to have any communication with
you as jurors.  That's the rule.  You may not say hello or even
wave.  That goes for you, the lawyers, and the witnesses.  In
this courthouse, you may see people in the elevators.  So if
you run into one another, please don't acknowledge them or
expect them to acknowledge you.  They are under instructions
not to have any communications, and they are going to observe
that rule.

          If at any point in the trial you recognize someone in
the courtroom, including a friend or family member, please let
me know immediately.  If this occurs while the trial is in
session, please raise your hand.

          Don't read or listen to anything touching upon this
case in any way.  Don't try to do any research on your own or

j562van1

 1    conduct your own investigation.  This means, for example, that

 2    you should not consult a dictionary, search the Internet,

 3    websites or blogs, or use any electronic tools to obtain

 4    information about this case.  If you see something about this

 5    case in the newspaper, you must not read the article.  Avoid

 6    watching television discussions about this case or issues

 7    involved in this case.  Your sworn duty is to decide this case

 8    solely and wholly on the evidence presented in this courtroom.

 9              If you wish, you can take notes while the evidence is

10    being presented to you.  This is permitted because so many

11    people find that taking notes helps them focus on the testimony

12    being given.  You should not try to summarize the testimony,

13    however.  We have two excellent court reporters who take down

14    everything said throughout the trial.  Your job is to listen to

15    the testimony and assess the credibility of witnesses.  If you

16    do take notes, do not let it distract you from that task.

17    Moreover, your notes are for your private use only, as a way to

18    help you recall the testimony when you begin your

19    deliberations.  Your notes are not entitled to any greater

20    weight than the recollection of a juror who did not take notes.

21    Finally, you may not take your notes away from the court.

22    Leave them in the jury room at the end of each day.

23              Let me tell you again how important your service is

24    and how much we appreciate it.  During a trial, all of us have

25    to be here before any work can be done -- that includes the

j562van1

1   attorneys; the witnesses; the court reporter; me, the judge;

2   and you, the jury.  If one person is missing, everything stops.

3   That's why this makes it a little bit different from work.

4   This is not a situation where you can simply call in sick.

5   There are, of course, extraordinary circumstances that may

6   excuse you from serving on this jury, but in all other

7   circumstances, we need you to be here every day and on time.  I

8   understand that this may impose a burden but, as I have said,

9   this is an important service and one that is greatly

10  appreciated.

11          The trial day starts at 9:30 except for Fridays, when

12  we start at 9 a.m.  About half an hour before we start, we will

13  open up the jury room and provide you with a light breakfast.

14  Coffee and a little snack, some tea.  We also provide you with

15  an afternoon snack when we take our afternoon break.  We cannot

16  provide you with lunch.

17          The morning session will last until 12:45.  On Monday

18  through Thursday, we will resume at 2:00 and go until 4:30.  On

19  Fridays, we will end at 1 p.m. with no afternoon session.

20  There are breaks in the morning and afternoon for 15 minutes.

21          Here is how we are going to proceed.  The government

22  will make an opening statement, which is an outline of what

23  they hope to prove and to help you understand the evidence as

24  it comes in.  Next, the defendants may make an opening

25  statement, but they do not have to.  Please remember as you

j562van1

1    listen to the opening statements by the lawyers that their

2    statements are not evidence.

3         Then government will start presenting its witnesses

4    and the defense may cross-examine those witnesses.  Following

5    the government's case, the defendants may, if they wish,

6    present witnesses, but they do not have to do so.

7         After all the evidence is in, each side will have the

8    opportunity to get up again and present their closing arguments

9    to you.  In these arguments, they are going to summarize and

10   interpret the evidence.

11        And then of course I will instruct you on the law.

12        After all that is completed, you will retire to

13   deliberate on your verdict.

14        Now for some housekeeping matters.  Let me introduce

15   David Gonzalez, who is my courtroom deputy.  You are going to

16   be working with Mr. Gonzalez.  He will help you in the jury.

17   Room he will give you the notepads if you want to take notes.

18   If you have any troubles or problems, see Mr. Gonzalez.

19        Amy Torres and Annie O'Toole are my two law clerks who

20   assist me on legal matters.  Our court reporter is Kristen

21   Carannante, and Eve Giniger is the other lady who takes notes.

22        So we are going to take a break now for about ten

23   minutes.  You can hang up your stuff, and then we will resume

24   with the opening statements.

25        We are going to rearrange your seats so that the first

j562van1

six seats in the first row, six seats in the second row will be

all together, and the two alternates will sit in the third row

by themselves.  We will make those rearrangements while you are

on break.

Thanks very much.  Enjoy your break.

(Continued on next page)

j562van1

```
 1              (Jury not present)

 2              THE COURT:  See you in ten minutes.

 3              MS. FENDER:  Thank you, your Honor.

 4              (Recess)

 5              (Jury not present)

 6              THE COURT:  Ms. Ghosh, you are going to make the

 7    opening?

 8              MS. GHOSH:  Yes, your Honor.

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

j562van1

1          (Jury present)

2          THE COURT:  Please be seated.

3          Ms. Ghosh.

4          MS. GHOSH:  Thank you, your Honor.

5          This is a case about drug dealers, a ring of drug

6    dealers that sold thousands and thousands of doses of heroin,

7    week after week, for years, including heroin that was mixed

8    with an even more dangerous drug called fentanyl, and these two

9    defendants, Paul Van Manen and Kenneth Charlton, were members

10   of that group who found customers, sold heroin, and ignored the

11   consequences.

12          In the fall of 2017, one person overdosed on the

13   group's drugs.  He was able to be saved by a firefighter.  But

14   less than two months later, one of Van Manen's customers wasn't

15   so lucky.  When that young man overdosed from drugs, Van Manen

16   had sold him, he died, and that's why we are here today.

17   Because of the choices they made and the things they did,

18   Van Manen and Charlton have been charged with conspiring, or

19   agreeing with others, to distribute heroin and fentanyl and

20   Van Manen has been charged with agreeing to distribute drugs

21   that caused two overdoses, one of them fatal.

22          Let me step back.  I want to do two things in my time

23   before you this afternoon.  First, I'm going to give you a

24   preview of what the evidence will show about these defendants'

25   crimes.  Then I will explain how the government will prove its

j562van1

case.

So what will the evidence show?  First, you will learn
how the defendants got the heroin and fentanyl that they sold
to others.  You will hear that the defendants were part of a
group of heroin dealers who operated mainly out of Staten
Island.  Most of the time the defendants and others in their
group got their heroin from a supplier in Brooklyn, who was
just a short trip over the Verrazzano Bridge.

You will learn that they sold their drugs to customers
on Staten Island.  The heroin came prepackaged from the
suppliers in tiny envelopes called glassines or bags.  Now,
particularly when mixed with fentanyl, just a few of those
little bags, even two or three, can cause an overdose.  But the
defendants and their associates sold hundreds and hundreds of
these bags every single day.  They sold some of this heroin
directly to users.  They also acted as middlemen and sold
larger amounts of drugs to other dealers who in turn sold to
users on the street.  The drug crew repeated this cycle day
after day.  Thousands and thousands of doses of heroin,
kilograms worth, for years, from 2013 until January 2018, when
the defendants and other members of the drug ring were
arrested.

During those years, they worked together to obtain and
sell drugs.  They drove each other around to customers or to
get more heroin from Brooklyn.  They sold each other drugs on

j562van1

credit.  They shared and referred customers.

Now, different members of the group had different

roles.  Van Manen was one of the primary dealers in the drug

ring.  You will learn that he picked up about 200 to 400 bags

of heroin multiple times every week from suppliers and then

peddled those drugs to users and other resellers.  Charlton was

one of the resellers that other members of the heroin ring sold

to, and he then sold directly to users.  And at times, when his

own heroin habit got in the way and he didn't have enough money

to buy drugs outright, he referred customers to another dealer

in the drug ring.  In return, he got drugs to use and to refill

his supply so he could keep selling.

Now, both Charlton and Van Manen used some of the

heroin themselves, but make no mistake:  This was business.

Increasing the number of customers, making sure they had high

quality product, and trying to turn that product into profit,

feeding off the addictions of their customers, nothing was

going to get in the way of that business, not even when people

got hurt, not even when someone died.

You will learn that one of the people injured by the

drugs peddled by this group was himself a dealer in the drug

ring.  Late one night in October of 2017, Van Manen picked him

up and they drove to Brooklyn to pick up drugs from their

supplier, as usual.  The next morning, this dealer used just

two of those little bags of heroin and overdosed.  That heroin,

j562van1

like other batches the drug ring sold, was laced with fentanyl,
a drug even more potent, more toxic, than heroin.  But the fire
department rushed to the scene and they were able to save this
man's life.  This person's overdose was well known within the
drug ring.  You will learn that Van Manen talked about it with
other members.  He talked about how the group's fentanyl-laced
heroin, heroin that Van Manen was selling as well, had caused
that overdose, but that did not stop Van Manen's drug dealing.
Business as usual every day.

          In less than two months after that dealer's overdose,
Van Manen sold heroin again laced with fentanyl that caused
another overdose.  This time it was fatal.  One of his
customers, Michael Ogno, died.  You will learn that on December
1, 2017, Van Manen sold heroin to Ogno.  That same day, Ogno
used that heroin laced with fentanyl and it killed him.  Ogno's
girlfriend found his body hours later.  On his dresser she
found the empty bags of the heroin that Van Manen had sold him.
On his nightstand was the syringe Ogno had used to inject the
drugs.  He was just 26 years old.  But even this didn't stop
Van Manen from continuing to sell.  Business as usual.

          So that's an overview of what I expect the evidence
will show.

          Now, how will the government prove its case?  Well,
partly through the defendants' own words.  You will hear and
see the defendants planning their sales, negotiating prices,

j562van1

```
1    trying to avoid law enforcement, recruiting new customers.  You
2    see, law enforcement had wiretaps on the phones of some members
3    of the drug ring and the defendants' phones were seized and
4    searched after their arrests last year.  So you will hear calls
5    and see text messages that they sent to associates and
6    customers when they had no idea they were being recorded, for
7    example, texts in which Charlton refers customers to a dealer
8    in the drug ring or texts in which Charlton agrees to start
9    working for that dealer again after a break because he wasn't
10   using heroin anymore, so he said he wouldn't do something
11   stupid like get arrested.  And you will see the text messages
12   between Van Manen and Michael Ogno, the overdose victim, on the
13   day of Ogno's death arranging to meet up so Van Manen could
14   supply Ogno with heroin.  Those were the last text messages
15   Ogno ever sent.
16            You will also see physical evidence, like some of the
17   thousands of heroin bags that were distributed by the
18   defendants and other members of the drug ring, heroin and
19   fentanyl that was seized by law enforcement when their
20   defendants and associates slipped up and sold to an undercover
21   officer or got arrested.  You will see photographs, like some
22   taken during surveillance of the defendants and their
23   associates doing drug deals and others from the scenes of the
24   overdoses.  You will see evidence of some of the money that the
25   defendants pocketed for peddling their drugs.  For instance,
```

j562van1

you will see records of the money that Michael Ogno sent to
Van Manen on the day he died, payment for the drugs that killed
him.

And you will also hear from a number of witnesses.
You will hear from some of the first responders who saw the
aftermath of the crew's heroin sales, like the firefighter who
was able to revive the dealer who overdosed and the police
officer who responded to the scene of Michael Ogno's fatal
overdose.  You will also hear from Michael's girlfriend.  She
will tell you what she knew about Michael's dealer and what it
was like to find his body.  You will also hear from law
enforcement officers, like a detective who spent months
investigating some of the members of the drug ring, and you
will hear from members of the heroin ring themselves, insiders
who worked directly with the defendants and their associates,
who will tell you all about this drug ring.  Like the
defendants, each of these insiders had a slightly different
role, and so each one will give you a different piece of the
puzzle.  They will explain to you how these two defendants
operated, how they got their heroin, where they stored the
drugs, how they recruited customers, the inner workings of the
group.

Now, make no mistake about it, these witnesses are not
testifying out of the goodness of their hearts.  Just like the
defendants, they are drug dealers who committed serious crimes,

j562van1

1    and they are cooperating with the government in the hopes of

2    getting a reduction in their sentences.  But the question is

3    not whether you like them or what they have done.  The question

4    is whether they are telling you the truth.  So listen carefully

5    to their testimony and consider how what they are telling you

6    fits with all of the other evidence in this case, like the

7    phone calls, the text messages, the physical evidence, and the

8    surveillance.

9          Finally, you will hear from a medical examiner who

10   will explain how the drugs Michael Ogno ingested killed him and

11   why the heroin and fentanyl sold by these defendants is so

12   dangerous.

13         Now, at the end of the trial, we will have the chance

14   to speak with you again about how all of the evidence fits

15   together.  Between now and then, I am going to ask you to do

16   three things:  First, pay close attention to the evidence;

17   second, listen to Judge Crotty's instructions on the law; and,

18   third, use your common sense, the same common sense you use in

19   your everyday lives.

20         If you do those three things, the defendants will get

21   a fair trial, the government will get a fair trial, and you

22   will reach the only verdict consistent with the evidence, the

23   law, and common sense:  The defendants, Paul Van Manen and

24   Kenneth Charlton, are guilty.

25         THE COURT:  Thank you, Ms. Ghosh.

j562van1

            Ms. Sideris.

            MS. SIDERIS:  Thank you, your Honor.

            Paul Van Manen is an addict.  He is a junkie.  He
bought heroin from Medin Kosic and he sold that heroin to
others, to other addicts.  That's not what he is charged with
here.

            This entire case will start and end with one question:
Was Paul Van Manen a member of the Kosic drug conspiracy?  And
the answer to that question is no.

            The evidence will show that Medin Kosic was only one
of Paul Van Manen's drug dealers.  You will hear the truth that
Paul did not have any deal with Kosic where he would be able to
buy heroin on credit from him.  Medin Kosic did not give Paul
any discount like he did members of his conspiracy.  Kosic
would not tell Paul where or to whom he could sell heroin.
Kosic would not get any kind of kickback from heroin that Paul
sold.  Paul did not work for or with Kosic.  He did not manage
Kosic's stash house.  He did not package heroin for Kosic.  He
did not get him additional customers.

            All Paul did was buy grams of heroin at a time, using
some for himself to get high and then selling some of it so
that he could buy more, to keep the cycle going.  The only
relationship that existed between Kosic and Paul was that
Kosic, the seller, would sell heroin to Paul, the buyer.  And
ladies and gentlemen, buyer-seller does not make Paul a member

j562van1

1   of the charged conspiracy.  You will learn that buyer-seller

2   means Paul Van Manen is not guilty.

3          May it please the court, Judge Crotty; Mr. Van Manen;

4   and ladies and gentleman of the jury:

5          I would like to take this opportunity to thank you for

6   your time and cooperation during the jury selection process.  I

7   know that jury selection is tedious and a drawn-out process,

8   but I trust you will understand or at least you will come to

9   understand by the end of this trial the importance that jury

10  selection plays in a trial.  So on behalf of Mr. Van Manen,

11  Mr. Quijano, and myself, his court-appointed attorneys, thank

12  you.

13         Now, you have just heard the government's opening

14  statement.  You may have thought it was eloquent and even

15  persuasive.  It was not evidence of any kind.  In fact, up to

16  this point, you have not heard a single word of evidence.  Up

17  to this point, all you have heard are allegations and

18  accusations in the form of the indictment and the government's

19  opening statement.  Please remember the only reason we are even

20  here today is because Paul Van Manen pled not guilty to the

21  indictment and, as such, he is presumed innocent of each and

22  every allegation.

23         Perhaps the most important thing I can do, that I can

24  hope to accomplish right now is to remind you of what you have

25  promised to do as jurors, to keep an open mind.  Keep an open

j562van1

mind until you have heard all of the evidence, all of the

testimony -- the direct examinations and the

cross-examinations.

        While you are listening to the government's witnesses

and their evidence, please keep an open mind and remember this:

After the government's case, you will hear from Paul Van Manen.

He is going to testify, and he will tell you the truth about

all of the events and his conduct in relation to the

government's witnesses.

        Paul does not have to testify.  That's the law.  And

under the law, if he doesn't testify, you would not be

permitted to hold that against him because he has the

fundamental right to remain silent, because the burden of proof

is on the government and he is presumed innocent.  But he is

choosing not to remain silent.  He is choosing to testify

because he wants to explain the truth, he wants to explain the

government's evidence to you, and wants you to hear the truth.

So please keep your promise to keep an open mind until

Judge Crotty has instructed you on the law.

        Ladies and gentlemen, if you keep this basic,

fundamental promise, if you keep an open mind, contrary to what

you just heard from the government, you will find that the

evidence will not establish that Paul Van Manen was a member of

Kosic drug conspiracy.  The evidence will show that, rather

than having joined and been a member of the charged conspiracy,

j562van1

1    Paul was merely a customer.

2            Paul bought heroin from other people as well.  The

3    evidence will show that he bought small amounts of heroin every

4    couple of days.  He was not loyal to any drug dealer.  He just

5    needed to have his heroin.

6            And you will see that his dealer Kosic knew Paul was

7    an addict.  The evidence will show that he would take advantage

8    of that when Paul needed to buy heroin.  He would ask for

9    favors when Paul was on the way:  Pick up a slice of pizza; get

10   me a ride somewhere.  None of that benefited Paul in any way.

11   He didn't get a discount.  His dealer, his seller, Kosic, was

12   just using an addict because he could.

13           The evidence will show that Paul and his friend Doreen

14   Spinelli bought heroin together.  They used heroin together.

15   They would also sell heroin together to other addicts and then

16   use that money to buy more heroin for themselves.  The evidence

17   will show that before selling any of their heroin, the first

18   thing that Paul and Doreen would do is take care of themselves.

19   They would get high.  They were always first in line and first

20   to taste.

21           The evidence will show that Paul would buy small

22   amounts of heroin from Kosic –– ten to 20 bundles at a time.

23   That's not kilograms of heroin.  That's not a pound of heroin.

24   That's not an ounce of heroin.  The evidence will show that's

25   what amounted to grams of heroin.  You will learn that in one

j562van1

bundle of heroin is ten tiny envelopes containing around .03

grams of heroin.  So in an entire bundle of heroin is less than

half a gram.

        Paul engaged in criminal conduct.  He possessed and he

sold heroin.  He himself will admit that to you.  He doesn't

deny that.  He doesn't try to hide that.  Those are crimes, but

not the crime charged here.  That's not the question you will

be asked at the end of the trial.  The question is whether Paul

Van Manen is guilty -- is a member of the conspiracy charged in

the indictment.

        As you know, the government is also claiming that, as

a result of his alleged involvement in the conspiracy, Paul

Van Manen is responsible for Michael Ogno's death on December

1, 2017, and also for an individual Shaun Sullivan's alleged

overdose on October 5, 2017.

        The evidence will show that when Michael Ogno

tragically died of an overdose, found in his system was a

combination of drugs -- fentanyl, heroin, and Xanax.  At some

point before he died, Michael Ogno ingested heroin, fentanyl,

and Xanax.  All contributed to his death.  The evidence will

show that Michael Ogno and Paul Van Manen were friends; that,

like Paul, Michael Ogno was a drug addict, he was addicted to

heroin and other drugs; that Michael Ogno and his childhood

friend, Derek Yung used heroin and other drugs together

starting from high school; that Paul sold heroin to Michael

j562van1

Ogno; that Paul sold heroin to Derek Yung; also that Derek Yung

sold heroin to Michael Ogno and Derek Yung sold heroin to Paul.

The evidence will show that Derek Yung and Michael Ogno bought

heroin and other drugs from various dealers.  You are not going

to hear evidence that it was heroin or fentanyl from Paul that

caused Michael Ogno's death.  At the end of all the evidence,

you will not hear from where Michael Ogno got the drugs that

led to his fatal overdose.

          Now, Shaun Sullivan's overdose on October 5, you will

hear evidence that Shaun Sullivan was a drug dealer.  He was

part of the charged conspiracy.  He and his wife Diane used

heroin together and sold heroin together.  They sold heroin to

a lot of people.  On the morning of his alleged overdose, Shaun

Sullivan and his girlfriend, Corrine, were using heroin

together; that on October 5, at around 9 a.m. Shaun Sullivan

and Corrine were in a bed and breakfast in Staten Island

getting high, and Corrine called 911.

          Thirteen hours earlier, Paul and Doreen were on their

way to pick up heroin from their dealer, Kosic, and they gave

Shaun Sullivan a ride.  The evidence will show that, per

Kosic's request, it was Shaun Sullivan alone who got out of the

car and met with Kosic to purchase the heroin for himself and

Paul and Doreen.  After Shaun Sullivan gave them their heroin,

Paul and Doreen proceeded to get high without incident.

          The next day, the next morning, Corrine called 911.

j562van1

1   Shaun was taken to the hospital and left a few hours later.

2   The evidence will not show what drugs were in his system, but

3   Shaun Sullivan is going to testify in this case as a

4   cooperating witness.

5           In attempting to meet its burden beyond a reasonable

6   doubt that Paul Van Manen was a member of this conspiracy, the

7   government will rely on the testimony of three cooperating

8   witnesses.  Unlike Paul, all three of them were members of the

9   charged conspiracy.  The evidence will show that they have pled

10  guilty to the same charge that Paul faces, but before they pled

11  guilty, they made and signed a deal with the government.

12          The evidence will show in this deal the parties are

13  the government and the witness.  Judge Crotty is not part of

14  this deal.  And like any deal, each party is getting a benefit.

15  You will learn that the government gets this witness to plead

16  guilty and the government gets this witness to cooperate, to

17  testify.  In return, the witness gets the government will write

18  a letter to Judge Crotty when it comes time for that witness's

19  sentencing, a very powerful letter.  The witness will tell you

20  that for what he has pled guilty, for that charge, he can be

21  sentenced up to a maximum of life imprisonment and the witness

22  will tell you for what he pled guilty there is a mandatory

23  minimum sentence.  For Shaun Sullivan and Anthony Francese,

24  they are facing a mandatory minimum of ten years in prison.

25  For Jasmin Cejovic, he is facing a mandatory minimum of 20

j562van1

1    years in prison.  But with this letter that the government will

2    write to Judge Crotty, they no longer face the mandatory

3    minimum sentence.  The evidence will show that, with that

4    letter, Judge Crotty can sentence the witness to anything from

5    zero to life.  That is their deal.  That is what the witnesses

6    understood they could get for testifying against Paul

7    Van Manen.

8            Now, the witnesses will tell you that to get this

9    letter, they have to do more than just testify.  They must tell

10   the truth.  Listen carefully to the witness when he tells you

11   who decides if he told the truth to qualify for this amazing

12   letter that lets him escape a mandatory minimum sentence.  For

13   the purpose of the letter, it is not you who decides.  It is

14   also not Judge Crotty.  The witness knows it is the government

15   who decides if the witness has told the truth, it is the

16   government who decides if Shaun Sullivan and Anthony Francese

17   have the chance to escape from a mandatory minimum sentence of

18   at least ten years, and it is the government who decides if

19   Jasmin Cejovic can escape a prison sentence of at least 20

20   years.

21           Please bear that in mind.  Remember that as you

22   evaluate the testimony of Shaun Sullivan, Anthony Francese, and

23   Jasmin Cejovic.  Listen to Shaun Sullivan when he tells you how

24   worried he was about facing more than ten years when he decided

25   to cooperate and testify against Paul.

j562van1

1          Another witness you will hear from is Derek Yung.  For

2     testifying against Paul Van Manen, Derek Yung gets the promise

3     of never being prosecuted for the crimes which he is going to

4     admit -- which he has admitted -- selling drugs, selling

5     heroin, including selling heroin to his with a childhood friend

6     Michael Ogno, who had a fatal overdose.  And all Derek Yung has

7     to do is testify against Paul Van Manen.  And if the government

8     decides he told the truth, he gets to walk away and he never

9     has to even plead guilty to a crime.

10          Some of the evidence in this case will be in the form

11    of phone calls or text messages.  Please remember, these may

12    appear to have one meaning on their face, but we all know that,

13    out of context, words or even short conversations, these can be

14    interpreted to have any meaning, they can be interpreted to

15    have two opposite, extreme -- extreme opposite meanings

16    depending on who is doing the interpretation, especially text

17    messages.  So wait to hear for the explanation from Paul.  Wait

18    to hear from him the truth.  Keep an open mind.

19          In a short while, the trial will start.  Witnesses

20    will be called.  They will testify.  They will be

21    cross-examined, and the parties will give their closing

22    arguments.  All I ask from you at this point is that you stay

23    true to your oath as jurors; that you keep an open mind until

24    you have heard from Paul Van Manen himself, until you have

25    heard the final instructions from Judge Crotty.

j562van1

After all of the evidence, Peter Quijano will come
before you and he will ask from you the only verdict that the
facts and the law will demand in this case: a verdict of not
guilty.

Thank you.

THE COURT:  Thank you, Ms. Sideris.

Ms. O'Neill.

MS. O'NEILL:  Buying heroin doesn't work like buying a
gallon of milk at the grocery store or ordering eggplant
parmigiana at your favorite Italian restaurant.  It's a game of
cat and mouse, where addicts and dealers are constantly trying
to get what one wants and the other needs.  And that makes
sense because heroin is illegal.

Now, Kenny Charlton was a homeless heroin addict who
was friends with other heroin addicts, and when they needed to
score, they got as much money together as they could, they
pooled that money and they started working the phones so that
they could get ahold of one of their many heroin dealers.  They
got as much as they could together, they called as many dealers
as they could, and then one of them answered the phone.

Finding drugs and hustling dealers is all part of
being a heroin addict.  And for Kenny, for Kenny, when he was
addicted to heroin, lying to his dealers was what it took to
get heroin.  When he was trying to score, he called multiple
dealers and his friends called multiple dealers just so that

j562van1

they could get heroin.  He lied to those dealers to get them to come.  And if one of those dealers didn't show up, he lied to them again.  He lied to them later and he said, oh, you missed out.  You missed out on the best customer.  You missed out. You missed out on all this money.  You missed out.  You were going to get a new regular customer.  He told them how many customers they would have had if only, if only, they would have shown up when he asked them to.

          This was part of Kenny Charlton's game.  This was what kept dealers interested in him.  And that makes sense, doesn't it?  It makes sense.  Just think about a homeless junkie in your mind.  It's a person who would say anything to get heroin. And tragically, that is what Kenny Charlton's life had become. It had become a never-ending quest for heroin, a never-ending series of lies and manipulations.  Kenny Charlton lost his work, he lost his home, he lost his self-respect to heroin.  He was in the margins of society and heroin had broken him.

          The government is going to show you text messages and phone calls from Kenny to one of his many heroin dealers and they are going to show you messages of him promising to pass the dealer's name to other heroin addicts.  You are going to hear him begging his dealer, offering anything he could just to get heroin.  "I have two Suboxones, please."  Trying to make the dealer feel sorry for him, "I'm pawning my tools.  I'm pawning my motorcycle seat.  I'm pawning my guitar.  I'm

j562van1

1    picking weeds, please."

2         Yes.  Before heroin ruined, ruined, Kenny Charlton's

3    life, he used to be a motorcycle-riding, guitar-playing, union

4    carpenter.  Now, by the time he was arrested in this case,

5    Kenny was a homeless junkie.  He lied.  He stole, he was barely

6    alive, and this, this, is what drug addiction looks like.  This

7    is what seven years of heroin addiction looks like.  This is

8    what desperation looks like.  This is what heroin does to

9    people.  You lose everything to it.  You lose everything.  And

10   that, that is why it is illegal.  That is why the government is

11   supposed to be prosecuting drug dealers.  Many of Kenny's

12   friends have overdosed and died, and Kenny himself has

13   overdosed.  Nobody would want their child to grow up to be like

14   Kenny Charlton.

15        The truth, the truth in this case is that Kenny had

16   many dealers, all different, but all very much the same.  His

17   dealers were people who had what he needed.  Some dealers were

18   better and worse than others.  Some dealers had better and

19   worse prices.  Some dealers charged more or less at various

20   times.  Some dealers were more responsive.  And some dealers

21   were eager for his business.  He circled through those dealers,

22   calling them, texting them, telling them whatever it took to

23   get heroin, and he had to do this every single day.

24        The government arrested Kenny Charlton in this case

25   and they charged him with participating in one of his heroin

j562van1

dealer's narcotics conspiracies.  The government is going to
put forth a bunch of witnesses and, quite honestly, we aren't
going to ask a lot of questions and that's because these
witnesses have nothing to do with Kenny and that's because
Kenny was not a member of this group or ring or conspiracy or
whatever you want to call it.

        And then, and then, the government is going to bring
in one of Kenny Charlton's drug dealers to testify against him.
That's right.  Jasmin Cejovic, the dealer Kenny knew as Min is
the government's main witness against Kenny.  Kenny wasn't a
part of the conspiracy we are talking about here.  He didn't
know anything about the operation.  He didn't know anything
about who Kosic was or where the stash house was.  He didn't
know any of this, and he didn't care to.  Who Min got his drugs
from or where they were stored, that wasn't anything to him.
He just needed to get high.  He kept Min's number, he used it
off and on for stretches of time, and then Min cut him off, and
then he hustled another dealer until that one cut him off.
That's what being a drug addict is.  That's what it does to
you.  It is a vicious, vicious cycle, over and over and over
again, trying desperately to get drugs.

        The truth?  The truth is that Min preyed on Kenny and
addicts like him.  To Min, Kenny was just a dollar sign.  Min's
this wannabe Playboy gangster, dressing in fur coats and fancy
watches, making a rap video, making a rap video while he was

j562van1

1        out on bail in this case about selling drugs.

2                    (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. O'NEILL:  And Min, Min is now allowed to prey on

2     Kenny again, as Min tries to trade his jail sentence for

3     Kenny's.  He made hundreds of thousands of dollars preying on

4     the backs of addicts, just like Kenny, and now he is going to

5     get time off his sentence?  He is going to get time off his

6     sentence for testifying against Kenny?

7          When you are hearing this guy talk, ask yourself:  Is

8     this for real?  Is this guy believable?  He is not.  He is not

9     believable.  He is a liar.  He is a liar.  And when I come back

10    up here at closing, you are going to hear me tell you exactly

11    how he lied.

12         Kenny Charlton was a heroin addict.  There is

13    absolutely no denying that.  He tried to get as much heroin as

14    he could so that he could get high.  That's what he did.  There

15    is no denying that.

16         You could say there is something wrong with his

17    character; he was weak; he succumbed to addiction.  But this

18    case, this case is not about whether Kenny Charlton is weak or

19    an addict or a small-time con.  It is about whether Kenny

20    Charlton was a member, a member of this conspiracy, to

21    distribute narcotics.  And ladies and gentlemen, that is

22    ridiculous.

23         Kenny Charlton isn't Min or the other members of this

24    conspiracy.  He is a victim.  He is a drug addict.  He is a

25    victim of this conspiracy.  He is not a perpetrator.  Kenny

J568VAN2                        Wong – Direct

1   Charlton is innocent of these charges.  Kenny Charlton is not a

2   drug dealer and not a member of this conspiracy.  And when you

3   hear all the evidence, I know that you will return the only

4   verdict that is just, and that is that Kenny Charlton is not

5   guilty.

6          Thank you.

7          THE COURT:  Government will call its first witness.

8          MS. GHOSH:  Your Honor, the government calls Lee Wong.

9          THE DEPUTY CLERK:  Please state and spell your full

10  name for the record.

11         THE WITNESS:  First name Lee, L-E-E, last name Wong,

12  W-O-N-G.

13   LEE WONG,

14      called as a witness by the government,

15      having been duly sworn, testified as follows:

16         THE COURT:  Please sit down and make yourself

17  comfortable.

18         Pull yourself right up to the microphone.

19         OK, Ms. Ghosh.

20  DIRECT EXAMINATION

21  BY MS. GHOSH:

22  Q.  Sir, where do you work?

23  A.  256 Hylan Boulevard, Staten Island, New York.

24  Q.  What is that?

25  A.  That is our firehouse.

J568VAN2                         Wong - Direct

1    Q.  How long have you been employed at the firehouse?

2    A.  I have been on the fire department for two and a half

3    years.

4    Q.  What is your current title?

5    A.  Firefighter.

6    Q.  Generally speaking, what are your duties and

7    responsibilities as a firefighter?

8    A.  As a firefighter we respond to any emergency in regards to

9    fires, gas emergencies, water emergencies, as well as emergency

10   medical service.

11   Q.  What do you mean by emergency medical services?

12   A.  It could be an array of things, cardiac arrests, trauma,

13   anything in regards to, if you call 911, we are usually the

14   first ones to respond.

15   Q.  What type of training do you receive regarding emergency

16   medical service procedures?

17   A.  The type of training that we receive, right before you go

18   into the academy they give you training in the academy for

19   about 16 weeks, as well as a refresher course for emergency

20   medical services every three years after that.

21   Q.  Firefighter Wong, directing your attention to October 5,

22   2017, were you working that day?

23   A.  Yes, I was.

24   Q.  About how long had you been with the fire department at

25   that time?

J568VAN2                          Wong - Direct

1   A.  At that time, I just finished graduating April 12th of

2   2017.  So I figure about a couple of months.

3   Q.  On October 5, 2017, what shift were you working?

4   A.  That would be the 9 by 6, or 9 a.m. to 6 p.m.

5   Q.  Were you working alone or with others?

6   A.  I was working with others.

7   Q.  Did there come a time on that day when you were asked to

8   respond to a potential overdose?

9   A.  Yes.

10  Q.  How did you first get notified?

11  A.  We received a ticket through the Staten Island dispatcher

12  office via computer.  That ticket is then relayed to our

13  firehouse and we respond, and we basically turn out the company

14  at that point.

15  Q.  Where was the incident that you were responding to?

16  A.  I believe it was 1 Hylan Boulevard, on the corner of Hylan

17  and Edgewater.

18  Q.  What is located there?

19  A.  That would be a three-story multiple dwelling that was

20  converted into a bed and breakfast.

21  Q.  About how long did it take you to get to that location?

22  A.  A matter of minutes because it's only about three blocks

23  from our firehouse.

24  Q.  You mentioned a moment ago that once you got the ticket you

25  turned out the company.  Can you just explain what that means?

J568VAN2                          Wong - Direct

1    A.   Turning out the company would be 10-4'ing or acknowledging

2    the run via computer so that the Staten Island dispatcher knows

3    that we are on our way, as well as reading the ticket out for

4    everyone else in the firehouse, our members, so they know what

5    they are responding to.

6    Q.   I would like to show you now what has been marked for

7    identification as Government Exhibit 272.

8               MS. GHOSH:   Ms. Dunbar, if you could put that up just

9    on the witness screen.

10   Q.   Firefighter Wong, do you recognize this?

11   A.   Yes.

12   Q.   What is it?

13   A.   That is the address where we responded for the patient or

14   the victim.

15              MS. GHOSH:   Your Honor, the government offers

16   Government Exhibit 272 into evidence.

17              MR. QUIJANO:   No objection.

18              THE COURT:   272 is received in evidence.

19              (Government's Exhibit 272 received in evidence)

20              MS. GHOSH:   Ms. Dunbar, can you please publish

21   Government Exhibit 272 for the jury.

22   BY MS. GHOSH:

23   Q.   Firefighter Wong, when you arrived at this building, where

24   did you go?

25   A.   When we first pulled up to the building, we went to the

J568VAN2                         Wong - Direct

1   front of the building, parked there.

2   Q.  What did you do after parking?

3   A.  I proceeded to exit the vehicle, do a quick size-up of the

4   building, as well as grab the EMS supplies that we were going

5   to be needing for whoever was in there.

6   Q.  Where did you go next?

7   A.  We proceeded to the front entrance of the building up the

8   stairs -- from the picture you can see it -- and then we were

9   met by hotel management.

10  Q.  What happened after you met hotel management in the

11  building?

12  A.  He proceeded to let us know that we had a male, a young

13  male --

14              MR. QUIJANO:  Objection.

15              THE COURT:  Overruled.

16  A.  He proceeded to let us know that there was a male in the

17  establishment that was not responding and possibly unconscious.

18  Q.  Where did you go next?

19  A.  We proceeded to follow him to the second floor of the

20  building.

21  Q.  Who went to the second floor?

22  A.  That was myself and two other firefighters, as well as the

23  lieutenant and the hotel manager.

24  Q.  What did you see when you got to the second floor?

25  A.  When we proceeded to the second floor, the room of that

J568VAN2                        Wong - Direct

1    particular floor was open and we found an unconscious male.

2    Q.  I would like to show you now what has been marked for

3    identification as Government Exhibits 212A, B and E.

4         MS. GHOSH:  Ms. Dunbar, if you can put those up for

5    the witness, please.

6    Q.  Firefighter Wong, do you recognize these three exhibits?

7    A.  Yes, I do.

8    Q.  What are they?

9    A.  Those are pictures of the room where we found the victim.

10   Q.  Are they fair and accurate depictions of the room that you

11   entered on October 5, 2017?

12   A.  Yes, ma'am.

13        MS. GHOSH:  Your Honor, the government offers

14   Government Exhibits 212A, B, and E into evidence.

15        MR. QUIJANO:  No objection.

16        THE COURT:  212A, B and E are received.

17        (Government's Exhibits 212A, 212B and 212E received in

18   evidence)

19        MS. GHOSH:  Ms. Dunbar, can you please publish 212A

20   for the jury to start with.

21   BY MS. GHOSH:

22   Q.  Firefighter Wong, can you describe what view is depicted in

23   this photograph?

24   A.  That is the entrance to the room where we found the victim.

25        MS. GHOSH:  Ms. Dunbar, if you could put up 212B and

J568VAN2                    Wong - Direct

1   publish that for the jury.

2   Q.  Firefighter Wong, can you describe what is depicted in this

3   photograph?

4   A.  That would be the bed where we found the unconscious male.

5   Q.  Using the touchscreen in front of you, can you circle where

6   you found the victim, where he was when you first saw him?

7   A.  Yes, ma'am.  Give me one moment.

8            MS. GHOSH:  Let the record reflect the witness has

9   circled, from the view of the person looking at the photograph,

10   the right side of the bed.

11            THE COURT:  Yes.

12            MS. GHOSH:  Ms. Dunbar, if you could publish 212E for

13   the jury, please.

14   Q.  Firefighter Wong, can you describe what view is depicted in

15   this photograph?

16   A.  From the entranceway, if I was standing in front of the bed

17   in the previous picture, that would be to my rear.

18   Q.  What did you do first when you arrived at this room?

19   A.  When I first arrived in the room, my lieutenant was taking

20   a quick look at the patient.  I asked him to move out of the

21   way so I can assess the patient and see what kind of condition

22   he was in.

23   Q.  I am going to show you now what has been marked as

24   Government Exhibit 273.

25            MS. GHOSH:  Ms. Dunbar, can you put that up for the

J568VAN2                        Wong - Direct

1    witness.

2    Q.  Did you recognize this individual?

3    A.  Yes, I do.

4    Q.  Who is it?

5    A.  That is the patient that was unconscious on the bed.

6            MS. GHOSH:  The government moves to admit Government

7    Exhibit 273.

8            MR. QUIJANO:  No objection.

9            THE COURT:  273 is in evidence.

10           (Government's Exhibit 273 received in evidence)

11           MS. GHOSH:  Ms. Dunbar, if we can publish that for the

12   jury, please.

13   Q.  Firefighter Wong, do you know this individual's name?

14   A.  No, I do not.

15   Q.  What observations did you make about this individual when

16   you first saw him?

17   A.  When I first saw him, he was unresponsive.

18   Q.  Can you describe what you mean by him being unresponsive?

19   A.  When I finally got the lieutenant out of the way and I

20   began to assess him, I noticed that his breathing was very

21   shallow; his pupils, when I checked him with the flashlight,

22   were pinpointed or dilated.  I proceeded to try to pinch the

23   patient on his extremities, his arms and his legs, and I

24   received no response.

25   Q.  What, if anything, did you notice about the individual's

J568VAN2                          Wong - Direct

1    pulse?

2    A.   When I checked his radial as well as his carotid, they were

3    weak.

4    Q.   What do you mean by his radial or carotid?

5    A.   The carotid is the large nerve on his neck, as well as his

6    radial which is on his wrist of his arms.

7    Q.   You mentioned a moment ago that his pupils were dilated.

8    Can you explain what you mean by that, what the significance of

9    someone's pupils being dilated is?

10   A.   Pupils being dilated can show signs of a possible overdose.

11   Q.   Based on your training, what is the risk to someone with

12   these symptoms that you mentioned -- the shallow breathing,

13   weak pulse, dilated pupils -- if treatment is not rendered to

14   them?

15   A.   If treatment is not rendered to them, they would be

16   deceased.

17   Q.   What did you do after determining that this victim was

18   nonresponsive?

19   A.   After seeing that he was not responsive, I then proceeded

20   to assemble the naloxone or Narcan kit for distribution.

21            MS. GHOSH:  Ms. Dunbar, if you can put up for the

22   witness Government Exhibits 276, 277 and 278.

23   Q.   Firefighter Wong, did you just see those three photographs?

24   A.   Yes, I did.

25   Q.   Do you recognize what they showed?

J568VAN2                          Wong - Direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  They are the components of the naloxone, or Narcan kit,

4    that we use for someone suffering from an overdose.

5            MS. GHOSH:  Your Honor, the government offers Exhibits

6    276, 277 and 278 into evidence.

7            MR. QUIJANO:  No objection.

8            THE COURT:  Received in evidence 276, 277 and 278.

9            (Government's Exhibits 276, 277 and 278 received in

10   evidence)

11           MS. GHOSH:  Ms. Dunbar, if you could please publish

12   Government Exhibit 276 for the jury.

13   BY MS. GHOSH:

14   Q.  Firefighter Wong, can you explain what we see in this

15   photograph?

16   A.  That is the vial that contains the medication used for

17   someone that is suffering from an opioid overdose.

18           MS. GHOSH:  Ms. Dunbar, if you could publish 278,

19   please.

20           My mistake, if you can go to 277 first.

21   Q.  Firefighter Wong, what does this view show?

22   A.  That shows the rear part of the vial showing the dosage

23   amounts.

24           MS. GHOSH:  Ms. Dunbar, if you could just zoom in on

25   the vials so we can see it a little closer, please.

J568VAN2                          Wong - Direct

1    Q.  When you say it shows the dosage amounts, what are you

2    referring to?

3    A.  The 0 and 0.5; 1 and 1.5.

4          MS. GHOSH:  Now if we could publish Exhibit 278 for

5    the jury.

6    Q.  What does this show?

7    A.  That shows the actual injection or component that

8    introduces the medication to the patient.

9    Q.  Can you explain how this works, the three photographs we

10   have seen, how it all works together?

11   A.  Basically, what happens is that the vial gets screwed into

12   this component right here -- I'm just going to circle it for

13   you.

14         MS. GHOSH:  Let the record reflect the witness has

15   circled the yellow item on the top of Exhibit 278.

16         THE COURT:  Yes.

17   A.  That vial then gets screwed on the bottom of that

18   component.  Once it's screwed on, then we would place the nasal

19   distribution device, which is this component here, on top of

20   it.

21         MS. GHOSH:  Let the record reflect the witness has

22   circled the white object at the bottom of the photo as the

23   nasal distribution device.

24         THE COURT:  Yes.

25   A.  Once those components are put together, we would then place

J568VAN2                         Wong - Direct

1    it in the patient's nose, one of their nostrils, and proceed to

2    squeeze the plunger or the syringe on it, and they would

3    receive the medication.

4    Q.  Let's just step back for a moment.  You mentioned Narcan

5    and naloxone.  Can you explain what those are?

6    A.  Narcan or naloxone is the same.  Naloxone is the proper

7    term, but we use Narcan on the job.  Basically, what it does is

8    it prevents someone from overdosing.  It attaches itself to the

9    mucous membranes in your nose, or the membranes in your nose,

10   and proceeds to stop the reaction that causes an overdose.

11   Q.  What kind of overdose is Narcan or naloxone meant to

12   disrupt?

13   A.  Products that contain opioids, heroins, things like that.

14   Q.  What sort of training have you received on the use of

15   Narcan?

16   A.  Narcan is part of our emergency medical service training

17   over at the fire department, EMS academy, or emergency service

18   academy.

19   Q.  Does your training include how to recognize when it's

20   necessary to use Narcan?

21   A.  Yes, it is.

22   Q.  Based on your training and experience, what is your

23   understanding as to why Narcan is used?

24   A.  Narcan is used for someone that is suffering from an

25   overdose.  It is used to get them out of their overdose so that

J568VAN2                          Wong - Direct

1    they do not, for lack of a better word, die.

2    Q.  What is your understanding of what could happen if Narcan

3    is not administered to someone who is overdosing on opioids?

4    A.  If it's not introduced to them as soon as possible, that

5    person would be deceased.

6    Q.  Turning back now to October 5, 2017, how much Narcan did

7    you first administer to the victim?

8    A.  When we first arrived, we proceeded to give the victim

9    point five or a little less than point five milligrams in the

10   vial.

11   Q.  Did the victim revive after you gave him the point five

12   milligrams?

13   A.  Negative.  He was still unresponsive.

14   Q.  What did you do next?

15   A.  I proceeded to reassess the patient.  I saw that there was

16   no change in his condition.  So I then proceeded to give him

17   the whole vial.

18   Q.  What happened after you administered the rest of the vial

19   of Narcan?

20   A.  Within a few minutes, the patient started to come to or

21   become conscious; he opened his eyes.

22   Q.  Did there come a time when other responders arrived on the

23   scene?

24   A.  Yes, ma'am.

25   Q.  Who arrived next?

J568VAN2                          Wong - Direct

1    A.   The next parties that arrived were the EMTs, or the

2    emergency medical technicians.

3    Q.   What did the EMTs do when they arrived?

4    A.   When they first arrived on the scene, I turned to face them

5    and let them know what we had so they can begin assessing the

6    patient.

7    Q.   What is the role of EMTs?

8    A.   The emergency medical technicians are the next line in

9    regards to our emergency responses.  We are considered

10   certified first responders, so our role is to stabilize the

11   patient or to get them stabilized enough so that the emergency

12   medical technicians can start working on them or possibly

13   transport them for emergency purposes.

14   Q.   Why does an EMT respond to an incident such as this in

15   addition to someone like you responding?

16   A.   They received additional medical training to try to combat

17   the possible signs of overdoses or other emergencies that

18   someone may have.

19   Q.   After the EMTs arrived, did any other responders arrive at

20   the scene?

21   A.   Yes, ma'am.

22   Q.   Who arrived next?

23   A.   Next was the next level of our emergency response, that

24   would be the paramedics, as well as the New York Police

25   Department after that.

J568VAN2                          Wong - Direct

1    Q.  What is the role of the paramedics?

2    A.  The paramedics are, for lack of a better word, they are the

3    last say in regards to emergency responses.  They have

4    additional training that both the certified first responders

5    and the EMTs do not have.  They are also able to give someone

6    medication or different types of ways to stimulate the body if

7    they are going into cardiac arrest.

8    Q.  You mentioned the NYPD arrived as well?

9    A.  Yes, ma'am.

10   Q.  What is your understanding of why NYPD responds to

11   suspected overdoses?

12   A.  NYPD responds basically to oversee and take notes, take

13   control of the, I guess, location that we are in, to make sure

14   that nothing is being moved out of the room, as well as taking

15   notes of who provided what and what order everybody responded.

16   Q.  Is it your understanding that it's common procedure for

17   NYPD to respond to overdoses?

18   A.  Yes, ma'am.

19   Q.  About how long after the victim was revived did you leave

20   the room?

21   A.  Approximately 20 to 30 minutes, give or take.

22   Q.  Why did you leave then?

23   A.  We were advised by the paramedics that we were no longer

24   needed.

25   Q.  Other than responding to this incident on October 5, 2017,

J568VAN2                        Wong - Direct

1    did you have any other involvement in this investigation?

2    A.  No, I did not.

3    Q.  Why does this incident stand out so clearly in your mind?

4    A.  It stands out so clearly because that was actually the

5    first time I ever had to administer Narcan to a patient.  It

6    was only a matter of months after my graduation, and frankly, I

7    was a little nervous.

8              MS. GHOSH:  Just a moment, your Honor.

9              At this time, we would like to read a stipulation into

10   the record.  This is Government Exhibit 508, a stipulation

11   concerning fire department records.

12             The stipulation states that:

13             It is agreed between the parties that Government

14   Exhibits 801 through 803 are true and correct copies of records

15   of the New York City Fire Department, relating to an October 5,

16   2017 incident, that were made at or near the time of their

17   creation by, or from information transmitted by, a person with

18   knowledge of the matters set forth in the records, and kept in

19   the course of regularly conducted activity of the New York City

20   Fire Department.

21             Specifically, Government Exhibit 801 is a naloxone

22   usage report.

23             Government Exhibit 802 is a pre-hospital care report

24   summary.

25             Government Exhibit 803 is an incident history report.

1          The parties agree that Exhibits 801 through 803 are

2     authentic business records of the New York City Fire

3     Department.

4          The parties further agree that this stipulation and

5     Exhibits 801 through 803 may be received into evidence at trial

6     subject to any objections by the defendants on relevance

7     grounds.

8          The government moves to admit Government Exhibits 801,

9     802 and 803.

10          MR. QUIJANO:  No objection.

11          THE COURT:  801, 802 and 803 will received in

12     evidence.

13          (Government's Exhibits 801, 802 and 803 received in

14     evidence)

15          MS. GHOSH:  We would also move Government Exhibit 508,

16     the stipulation, into evidence.

17          THE COURT:  508 is received in evidence as well.

18          (Government's Exhibit 508 received in evidence)

19          MS. GHOSH:  Ms. Dunbar, if you can pull up Exhibit

20     801, please.

21          Could you publish that for the jury.

22     BY MS. GHOSH:

23     Q.  Firefighter Wong, do you have that in front of you?

24     A.  Yes, I do.

25     Q.  This report mentions a Lieutenant Shea on the fourth line

J568VAN2                         Wong - Direct

1    on the upper left?

2    A.  Yes.

3    Q.  Do you know who that is?

4    A.  That was an officer that was covering at the time in my

5    firehouse.

6    Q.  Could you read the date that's listed on this report?

7    A.  That would be October 5th of 2017.

8    Q.  What is the time administered?

9    A.  9:17.

10            THE COURT:   A.m. or p.m.?

11            THE WITNESS:   That would be a.m., your Honor.

12            MS. GHOSH:   The government would now like to read

13   another stipulation concerning hospital records.   This is

14   Government Exhibit 502.

15            This stipulation says that:

16            The parties agree that Government Exhibit 901 is a

17   true and correct copy of records of Staten Island University

18   Hospital, located at 475 Seaview Avenue, Staten Island, New

19   York, relating to the October 5, 2017 admission of an

20   individual, that were made at or near the time of their

21   creation by, or from information transmitted by, a person with

22   knowledge of the matters set forth in the records, and were

23   kept in the course of a regularly conducted activity of Staten

24   Island University Hospital.

25            The government offers Government Exhibit 502, the

J568VAN2                          Wong - Direct

1    stipulation, into evidence.

2              MR. QUIJANO:  No objection.

3              THE COURT:  502 is in evidence.

4              (Government's Exhibit 502 received in evidence)

5              MS. GHOSH:  The government offers Government Exhibit

6    901 into evidence.

7              MR. QUIJANO:  No objection.

8              THE COURT:  901 is in evidence.

9              (Government's Exhibit 901 received in evidence)

10             MS. GHOSH:  Your Honor, this may be -- I think it's

11   4:30.  Should we break, your Honor?

12             THE COURT:  Do you have much more for the firefighter?

13             MS. GHOSH:  Not much more.

14             THE COURT:  Do you have cross-examination?

15             MR. QUIJANO:  Yes, your Honor.

16             THE COURT:  We will break now.

17             You are excused.  You have to come back tomorrow

18   morning at 9:30.

19             THE WITNESS:  Thank you, your Honor.

20             THE COURT:  Ladies and gentlemen, we are going to

21   break for the day now.  We start at 9:30 and finish at 4:30.

22             Please remember my instructions.  Don't discuss the

23   case.  Keep an open mind.  Don't do any independent research.

24   Safe home tonight, and we will see you tomorrow morning at

25   9:30.  We will have coffee and tea for you at 9:30.

J568VAN2

1          (Jury exits courtroom)

2          THE COURT:  Anything to take up?

3          MR. FINKEL:  Just one thing from the government.

4          The ruling that this Court issued this morning, it's

5     the government's understanding that your Honor's ruling with

6     respect sympathy arguments was predicated on the notion that

7     the defendants would be taking the stand.  Obviously, in Ms.

8     Sideris's opening for Mr. Van Manen, it made clear that Mr. Van

9     Manen will be testifying here.  Ms. O'Neill's opening, however,

10    introduced a lot of facts that are not going to be in evidence

11    unless Mr. Charlton takes the stand, for example, his loss of a

12    job, the fact that he overdosed, the fact that friends of his

13    overdosed.  So we would just like to know whether or not Mr.

14    Charlton is going to take the stand.  Otherwise the government

15    has an application to strike sympathy arguments based on this

16    Court's ruling this morning.

17          THE COURT:  Ms. O'Neill.

18          MS. O'NEILL:  If Mr. Charlton does not take the stand,

19    we can strike the parts of the opening, as your Honor ruled

20    earlier this morning.

21          THE COURT:  Do what?

22          MS. O'NEILL:  I understood that your Honor ruled that

23    if the defendants don't testify, that you will be striking our

24    opening statements, portions of them.

25          THE COURT:  Yes.

J568VAN2

1              MS. O'NEILL:  OK.

2              THE COURT:  So you don't want to advise us now whether

3     Mr. Charlton is going to take the stand or not?

4              MS. O'NEILL:  Why would I?

5              MR. FINKEL:  Your Honor, when counsel, whether it's

6     the government or defense, makes an opening statement in a

7     federal trial, they have an obligation to argue facts with good

8     faith they believe will be introduced into evidence in this

9     case.  You can't have it both ways.  You can't a week from now

10    or seven days from now ask the jury to then strike several

11    arguments that they heard seven days ago.  If Ms. O'Neill

12    hasn't thought through whether or not Mr. Charlton is going to

13    take the stand, and it appears to the government that he is not

14    going to, and therefore in the morning tomorrow the government

15    asks that Ms. O'Neill's arguments about sympathy be struck.

16             THE COURT:  What do you say, Ms. O'Neill?

17             MS. O'NEILL:  It's hard to even respond to this.

18             THE COURT:  You can't keep on making representations

19    about what you're going to prove contingent upon your client's

20    testifying.  It's going to be four or five days by the time you

21    make your decision.  In the meantime you have been making all

22    these arguments, leaving in the jury's mind -- this is kind of

23    like something out Trump world, where you keep on talking about

24    what you're going to do, but you never get around to doing it.

25             MS. O'NEILL:  But we haven't started our case or

J568VAN2

1    cross-examined any witnesses yet.

2               THE COURT:  I will think about this overnight.

3               MR. FINKEL:  Thank you, your Honor.

4               MS. FENDER:  What time would you like to see the

5    parties tomorrow before the jury resumes?

6               THE COURT:  I will be in at 8:30, 9:00.

7               Why don't you get here at 20 after 9.

8               MS. FENDER:  Thank you, your Honor.

9               THE COURT:  See you in the morning.

10              (Adjourned to May 7, 2019, at 9:20 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 LEE WONG

Direct By Ms. Ghosh . . . . . . . . . . . . .40

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 272   . . . . . . . . . . . . . . . . . . . .43

 212A, 212B and 212E  . . . . . . . . . . .45

 273   . . . . . . . . . . . . . . . . . . . .47

 276, 277 and 278 . . . . . . . . . . . . .49

 801, 802 and 803 . . . . . . . . . . . . .56

 508   . . . . . . . . . . . . . . . . . . . .56

 502    . . . . . . . . . . . . . . . . . . .58

 901   . . . . . . . . . . . . . . . . . . . .58